UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| EDWIN VELEZ, Plaintiff, v. MICHAEL MINEV, et al., Defendants. | Case No. 3:21-cv-197-ART-CSD<br><br>ORDER ADOPTING R&R AND GRANTING MOTION FOR SUMMARY JUDGMENT<br>(ECF Nos. 147, 160) |

Plaintiff Edwin Velez is an inmate in the custody of the Nevada Department of Corrections ("NDOC"). He sues Defendants for deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Kim Adamson, Michael Minev, Martin Naughton, and Carol Alley, who are or were all doctors employed by NDOC ("NDOC Defendants"), have moved for summary judgment. (ECF No. 147.) All of these Defendants were on the Utilization Review Panel ("UR Panel"), except for Dr. Adamson, who was Mr. Velez's treating physician at Lockwood Correctional Center. Judge Denney issued a Report and Recommendation ("R&R") recommending that the motion be granted. (ECF No. 160.) Mr. Velez objected to the R&R and the NDOC Defendants responded. (ECF Nos. 161, 165.) The Court now grants the motion for summary judgment.

## I. Undisputed Facts

Around late September 2017, Plaintiff Edwin Velez was injured allegedly while working in the kitchen at Lovelock Correctional Center. (ECF No. 149-1) When he saw Dr. Kim Adamson, his left testicle was swollen and irregularly shaped. In mid-November 2017, he received an ultrasound at Humboldt General Hospital ("HGH") in Winnemucca, Nevada, which found a "large hydrocele," or fluid buildup, in his left testicle. (ECF No. 149-1 at 4-5.) After Mr. Velez filed a medical kite asking for follow-up, prison staff offered to put him on the list for

general surgery. (*Id.*) Mr. Velez had his first appointment with Dr. Adamson in early December (ECF No. 144-3 at 10), followed by a consult in Carson City with a Dr. James Cunningham. (ECF No. 149-1 at 8-9.) Dr. Cunningham diagnosed him with a large symptomatic left hydrocele and wrote that he advised him "in detail" of the risks associated with a hydrocelectomy, including recurrence, bleeding, infection, and pain. (*Id.*) Although it is not in the record if Dr. Cunningham was a urologist, the address of his clinic is that of Carson Urologists. (*Compare id. with id.* at 25.)

Mr. Velez had a hydrocelectomy on January 30, 2018 at HGH. (I*d.* at 10.) The HGH surgeon, Dr. Gaulin, found during surgery that the hydrocele was at least ten centimeters in diameter, and suctioned 200 cc of "serous fluid" out of it before dissecting it from the testicle. (*Id.*)

After his January 2018 hydrocelectomy, the swelling in Mr. Velez's left testicle returned. In November 2018, Dr. Adamson observed that Mr. Velez's left testicle was around 6 inches in diameter. (ECF No. 149-1 at 14.) Dr. Adamson requested a "surgical consult," which the UR Panel authorized. (ECF No. 144-3 at 9.) Dr. Adamson's subsequent notes state that Mr. Velez's swelling "was drained" sometime around January 2019. (ECF No. 149-1 at 16.) Nothing in the record indicates that Mr. Velez received the surgical consult ordered, and the drain may have been spontaneous rather than due to medical intervention. (*Id.* at 26.)

In February 2019, Dr. Adamson wrote that Mr. Velez's "entire scrotum [was] swollen," and requested a urology consult from the UR Panel. (*Id.* at 16.) The UR Panel approved an in-house clinic referral for Mr. Velez to be seen in a urology clinic. (*Id.*) While it is not clear what happened as a result of Mr. Velez's referral to a urology clinic, he saw Dr. Gaulin again in March 2019. Dr. Gaulin found that the swelling was a "hematoma," which is a postoperative pooling of

blood (ECF No. 149-2.) Dr. Gaulin drained "150 cc of old blood" and left the drain in Mr. Velez's body, directing removal in two to three days. (*Id.* at 17.)

Soon after the draining of the hematoma in March 2019, it became clear that Mr. Velez's problem was still not entirely solved. In April 2019, Mr. Velez had another surgical consult with Dr. Adamson, who observed that his "hydrocele continues to drain w/in scrotum. Apparently the opening of the Internal Ring was not closed." (*Id.* at 21.) Around the same time, Mr. Velez described his pain as a six out of ten. (*Id.*) About two weeks following the notation regarding the unclosed opening, Dr. Adamson referred Mr. Velez to the UR Panel once again for a "Urology Consult + Treatment," noting that Mr. Velez's scrotum "has become large, tense + painful" due to a "complication of prior Hydrocelotomy." (*Id.* at 29.)

While the UR Panel's response to Dr. Adamson's referral to urology is not in the record, in early May 2019, Mr. Velez saw Dr. Gaulin again rather than a specialist. Dr. Gaulin assessed that the new fluid buildup was a "seroma," or a post-hematoma fluid collection (ECF No. 149-2). Dr. Gaulin also noted that the drain that he had prescribed to be removed in March was still in place in May. (ECF No. 149-1 at 29.) He drained 30 cc of "yellowish serous slightly brownish fluid" and wrote that it almost completely alleviated the swelling. (*Id.* at 24.)

Mr. Velez finally saw a specialist in urology on May 17, 2019, two days after Dr. Gaulin himself referred Mr. Velez for a urological consultation. (*Id.* at 25.) Dr. Roland Chen at Carson Urologists in Carson City diagnosed Mr. Velez with a recurrent hydrocele, rather than a post-operative seroma. He noted that Mr. Velez "underwent a 'hydrocelectomy' by Dr. Gaulin in Winnemucca on 1/30/18, but based on my review of the operative report, the tunica vaginalis was entered and some cautery was performed, but the tunica vaginalis was not excised, resulting in persistent hydrocele formation." (*Id.* at 27.) Dr. Chen said the reaccumulation of the hydrocele was "not surprising[]." (*Id.*) He also noted that Mr. Velez had a

"fistula tract" about one centimeter in diameter through which fluid was continuously draining into the scrotum. (*Id.* at 35.)

Following his consult with Dr. Chen, Mr. Velez was scheduled for a second hydrocelectomy. On May 23, 2019, Dr. Adamson referred Mr. Velez once again to the UR Panel for "Dr. Chen request to do Hydrocelectomy," which the UR Panel approved. (*Id.* at 29.)

The appointment for surgery with Dr. Chen was scheduled for October 8, 2019, about four months after the UR Panel approved it. (ECF No. 149 at 30.)

While waiting for his second hydrocelectomy with Dr. Chen, Mr. Velez reported discomfort. On June 10, 2019, Mr. Velez submitted a kite asking for a refill on his ibuprofen and antibiotic ointment, and noted that he still didn't know when he was going to go to surgery in Carson City. (ECF No. 149 at 31.) His prescription requests were approved, but no response for his implicit request for an update on his appointment appears in the record. (*Id.*) On June 21, 2019, Mr. Velez submitted another kite repeating his requests for ibuprofen and antibiotic ointment, and that he didn't know when he was going to be called for surgery. (*Id.* at 33.) He was told that he had a pending appointment with a urologist. (*Id.*)

On October 8, 2019, Mr. Velez saw Dr. Chen for surgery for "scrotal exploration with attempted hydrocelectomy." (*Id.* at 35.) During the surgery, Dr. Chen found a four to five centimeter cystic mass, which appeared to harbor "necrotic caseating tissue." (*Id.* at 36.) Although the mass may have been a tumor or an extreme inflammation, Dr. Chen noted that it would be "very difficult to salvage the testicle" in either case. (*Id.*) He therefore amputated the testicle. (*Id.*) Mr. Velez says in his pleadings that Dr. Chen told him it was "too late" to save the testicle and that it had to be amputated to prevent "further" damage (ECF No. 152), which NDOC Defendants do not specifically dispute.

## II. Disputed Facts

Mr. Velez alleges in his pleadings that Dr. Gaulin told him he had never performed a hydrocelectomy before. (ECF No. 161.) Dr. Gaulin disagrees, and says that by the time he treated Mr. Velez, he had performed numerous hydrocelectomies. (ECF No. 143-2.)

Mr. Velez says that the UR Panel delayed five months in sending him to Dr. Chen for surgery. (ECF No. 152.) However, Mr. Velez did not submit evidence to support this allegation. Records of the UR Panel show that it approved the request about a week and a half after Dr. Adamson's referral, on June 4, 2019. (ECF No. 149-3 at 2.) Although it is unclear how long the interval was between the UR Panel's referral and the contact with Carson Urologists to schedule the appointment, the Director of Nursing attributed the overall delay to Carson Urology's schedule. She wrote in her declaration that when the UR Panel approves a decision to send someone to a medical providers outside of the prison, "the date on which an appointment is scheduled is based on the availability of the outside provider." (ECF No. 147-2.)

## III. Legal Standard

### A. Review of Reports and Recommendations

This Court now reviews Judge Denney's R&R under the Federal Magistrates Act, which provides that a court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by [a] magistrate judge." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." *Id.* A court is not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Under this binding authority, only the objected-to portions of the R&R must be reviewed.

*See, e.g.*, *Fuller v. Lopez*, No. CV1905818PHXDWLCDB, 2021 WL 321234, at *3 (D. Ariz. Feb. 1, 2021) (citing S. Gensler, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 72, at 422 (2018)). The district court may still review the portions of the R&R not subject to an objection if it chooses, as nothing "preclude[s] further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard." *Id.* at 154.

**B. Summary Judgment**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting or disputing a fact "must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *Id.*

In determining summary judgment, courts apply a burden-shifting analysis. A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmovant bears the burden at trial, as is the case here, the movant can meet its burden by either (1) presenting evidence to negate an essential element of the nonparty's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to

establish an element essential to that party's case, and on which the non-movant will bear the burden of proof at trial. *See id.* at 323-24. After the movant has met its burden, the burden shifts to the nonmovant to come forward with specific facts showing a genuine issue of material fact remains for trial. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although "[o]n summary judgment the inferences to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion," *id.*, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586-87 (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the non-moving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Angel v. Seattle-First Nat. Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981)). Instead, to survive summary judgment, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing admissible evidence that shows a genuine issue for trial. *See Celotex,* 477 U.S. at 324.

## IV. Analysis

Mr. Velez's only claim against the NDOC Defendants is for deliberate indifference in violation of the Eighth Amendment. (ECF No. 112.) He alleges that they knew Dr. Gaulin was not qualified to perform hydrocelectomies; that after Dr. Gaulin performed the hydrocelectomy, NDOC Defendants were aware that it was performed improperly; that they nevertheless sent him back to Dr. Gaulin for follow-up treatment; that they waited five months to approve Dr. Chen's referral for a surgical appointment; and that the delay and denial of medical care

resulting from all of these decisions caused pain and suffering, emotional distress, and the loss of his testicle. (ECF Nos. 86, 67.)

A claim for deliberate indifference to a prisoner's serious medical needs under the Eighth Amendment involves the examination of two elements: [1] "the seriousness of the prisoner's medical need and [2] the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds*, *WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). A plaintiff must show that the defendant's response to that need was deliberately indifferent, which is a "high standard" that entails something more than medical malpractice or even gross negligence. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Under the Eighth Amendment, deliberate indifference depends on an official's subjective state of mind. It is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Either action or inaction may lead to constitutional liability if an official is aware that a prisoner faces a substantial risk of serious harm, and nevertheless neglects that person's serious medical needs. *See id.* at 842. Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

Judge Denney concluded that NDOC's motion for summary judgment should be granted because Mr. Velez had not created a dispute of material fact

as to their deliberate indifference. (ECF No. 160.) The evidence did not show that NDOC Defendants should have known that Dr. Gaulin was not qualified to perform a hydrocelectomy, because Dr. Gaulin and an expert physician had both written declarations that he was qualified and Mr. Velez had presented no evidence in opposition. Mr. Velez also had not created a dispute of material fact that NDOC Defendants were deliberately indifferent in sending him back to Dr. Gaulin for multiple follow-ups, because there was no evidence that NDOC Defendants knew that something was wrong with Dr. Gaulin's treatment, and an expert declaration said that it was normal to have multiple follow-ups of the kind that Mr. Velez had after a hydrocelectomy. Finally, there was no dispute of material fact that NDOC Defendants were deliberately indifferent in delaying Mr. Velez's surgery by five months, because the evidence in the record only showed that the delay was due to the availability of Dr. Chen.

In his objection to the R&R, Mr. Velez says that he lost his testicle because NDOC Defendants delayed in getting him to a qualified urologist, that they knew or should have known that Dr. Gaulin's treatment was inadequate, and that they should have sent him to a qualified doctor such as Dr. Chen sooner. (ECF No. 161.)

Because Mr. Velez has objected to the R&R, the Court reviews the R&R *de novo*. On *de novo* review, the Court agrees that Mr. Velez has not brought evidence showing that the NDOC defendants were deliberately indifferent. At trial, it would be Mr. Velez's burden to establish that NDOC was deliberately indifferent in failing to send him to a different doctor earlier. If Mr. Velez has not brought sufficient evidence at this stage in the case to establish the existence of the elements essential to his case on this theory, then summary judgment must be granted to the NDOC Defendants. *Celotex*, 477 U.S. at 322.

Mr. Velez has theorized that Dr. Gaulin was not qualified to perform the 2018 hydrocelectomy and that NDOC Defendants were deliberately indifferent in referring him to a general surgeon with no experience in the first instance. Accepting for the purpose of summary judgment that Mr. Velez's statement that Dr. Gaulin told him that he had no experience in hydrocelectomies is true, Mr. Velez does not bring evidence that the NDOC knew or should have known this before referring him to Dr. Gaulin. Neither does Mr. Velez bring evidence to support his claim that a general surgeon is not qualified to perform hydrocelectomies.

Mr. Velez has also theorized that the recurrent swelling of his testicle and his need for multiple rounds of follow-up treatment should have alerted the NDOC Defendants that he needed to be sent to a qualified urologist rather than an unqualified general surgeon. Dr. Adamson noticed in April 2019, about six months prior to Mr. Velez's ultimate surgery, that fluid was draining improperly within his scrotum because "apparently the opening of the Internal Ring was not closed." (ECF No. 149-2.) Although the meaning of Dr. Adamson's notes are not completely clear, complications may have arisen because the drain was not removed from Mr. Velez's body within two to three days of the surgery, which would suggest the possibility of error on the part of someone from NDOC. On the other hand, Dr. Chen's notes from May 17, 2019, appear to fault Dr. Gaulin for causing a recurrent hydrocele by failing to completely excise the tunica vaginalis. Furthermore, Mr. Velez states in his pleadings that Dr. Chen, after removing the testicle, told him it was "too late"— suggesting that some error created chronic swelling, an elevated risk of necrotic tissue, and the necessity of amputation.

Despite these suggestive facts, Mr. Velez lacks evidence that NDOC Defendants caused his pain, suffering, and amputation by unduly delaying or denying care. *Celotex Corp.*, 477 U.S. at 323-24.

A year after the hydrocelectomy, Mr. Velez came to Dr. Adamson with what was later described as a hematoma. Dr. Adamson promptly referred Mr. Velez for a urology consult. Nothing in the record shows that Dr. Adamson was responsible for sending Mr. Velez to Dr. Gaulin, who is a general surgeon. Following Dr. Adamson's referral, the UR Panel referred Mr. Velez to an in-house urology clinic, and Mr. Velez had another appointment with Dr. Gaulin. Because the UR Panel's role was to approve appointments with outside providers, it was probably responsible for sending him to Dr. Gaulin. (ECF No. 147-2.) However, it is unclear whether the UR Panel would have been unreasonable for sending Mr. Velez back to Dr. Gaulin at this point. It is not necessarily indifferent to send a patient back to their original surgeon when that patient experiences complications after surgery. This was Mr. Velez's first follow-up in the record. The expert report of Dr. Cramer says that a post-operative hematoma is a normal complication that does not show a physician breached the standard of care. (ECF No. 149-2.) Dr. Cunningham's notes indicate that before Mr. Velez decided to pursue a hydrocelectomy, he told Mr. Velez that hydrocelectomies can result in bleeding. (ECF No. 149-1 at 8-9.) Mr. Velez does not bring contradictory evidence.

Upon seeing Mr. Velez for his hematoma, Dr. Gaulin drained it and prescribed that Mr. Velez should return in two or three days so that the drain should be taken out of his body. The uncontroverted evidence shows that this did not happen for a month. Mr. Velez alleges that NDOC Defendants erred in not returning him to the hospital for removal of the drain. Dr. Adamson's notes suggest that the failure to remove the drain may have contributed to Mr. Velez's pain and suffering due to subsequent complications. (ECF No. 149-2 at 21.) Yet Mr. Velez lacks evidence showing Dr. Adamson or the UR Panel knew that they needed to bring him back to HGH in two or three days. Neither does Mr. Velez

have evidence that Dr. Adamson or the UR Panel were the cause of the NDOC's failure to bring him back.

About a month after the hematoma procedure, Mr. Velez came back to Dr. Adamson with swelling, and Dr. Adamson again referred Mr. Velez for a urology consult, not a surgical consult. Mr. Velez has not brought evidence showing that Dr. Adamson was responsible for his subsequent referral to the general surgeon Dr. Gaulin. What the UR Panel did in response to Dr. Adamson's request is not in the record, but Dr. Gaulin drained what he diagnosed as a seroma and, at a follow-up appointment, referred Mr. Velez to Dr. Chen. Two weeks after Mr. Velez's procedure with Dr. Gaulin, and about a month after he had initially seen Dr. Adamson, Mr. Velez had a consultation with Dr. Chen. Although the UR Panel appears to have referred Mr. Velez to Dr. Gaulin rather than a specialist, the circuitous route that Mr. Velez had to take to the specialist created a delay of two weeks to a month. Under the circumstances, it cannot be said that the UR Panel was deliberately indifferent in sending Mr. Velez back to Dr. Gaulin for a second follow-up. There is no evidence in the record to show that this was a decision that was more careless than medical malpractice or gross negligence. *Toguchi*, 391 F.3d at 1060. The record instead contains an expert report stating that recurrent hydroceles and seromas may occur even when physicians comply with the standard of care. (ECF No. 149-2.) Although it is not clear if the issue was a recurrent hydrocele rather than a seroma, Dr. Cunningham wrote that he advised Mr. Velez that hydroceles can recur after a hydrocelectomy, and that Mr. Velez nevertheless gave informed consent to the hydrocelectomy. (ECF No. 149-1 at 8-9.)

Mr. Velez has alleged that the UR Panel was also deliberately indifferent in causing a delay of five months between his initial consult with Dr. Chen and his surgery. (ECF No. 152.) While he brought this argument his response to NDOC

Defendants' motion for summary judgment, he did not bring it in his objection to the R&R, and he did not submit evidence to support this allegation. The evidence in the record suggests that it was Dr. Chen's office that caused the delay, rather than NDOC. (ECF No. 147-2.) Records of the UR Panel show that it approved the request for a surgical appointment with Dr. Chen promptly, about three weeks after Mr. Velez's initial consult with Dr. Chen, and a week and a half after Dr. Adamson officially requested a surgical appointment from the UR Panel. (ECF Nos. 149-3 at 2.) Although Mr. Velez submitted kites during the five-month wait asking for ibuprofen and antibiotics, and to know the date of his surgery, there is nothing in the record to show that he himself knew that he needed emergency surgery or communicated that to NDOC Defendants. (ECF No. 149 at 31-33.)

In addition to the theories of deliberate indifference articulated in his counseled complaint, Mr. Velez also objects to the R&R for several reasons related to the overall functioning of the NDOC medical system. Mr. Velez alleges that the NDOC's process of sending physician recommendations of care by outside providers to the UR Panel is deliberately indifferent in and of itself, because the UR Panel's interest is in saving money for NDOC rather than ensuring high quality treatment, and because it creates extra layers of delay not experienced by people outside the prison system. Mr. Velez also argues that the Defendants have been denied qualified immunity in medical indifference cases brought by other inmates. The Court makes no comment on the truth of these allegations. It suffices to say that character evidence is not cognizable because it is of little probative value with regards to what happened in Mr. Velez's particular case. Fed. R. Evid. 404(a). There is no evidence to show that the person or entity responsible for the creation of the NDOC's procedures is a defendant in this case, and a claim against that person or entity would be a poor fit for the deliberate

indifference standard, which requires subjective knowledge of Mr. Velez's medical needs. *Farmer*, 511 U.S. at 837.

## V. Conclusion

IT IS THEREFORE ORDERED that the R&R recommending grant of NDOC Defendants' motion for summary judgment is ADOPTED. (ECF No. 160.)

IT IS FURTHER ORDERED that NDOC Defendants' motion for summary judgment is GRANTED. (ECF No. 147.)

IT IS FURTHER ORDERED that Defendants Carol Alley, Kim Adamson, Michael Minev, and Martin Naughton are dismissed from the case.

DATED: August 5, 2026

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE